## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

MICHAEL D. WATSON, JR., in his
official capacity as Secretary of
State and Trustee of the Public                                    PLAINTIFF
Tidelands Trust

v.                                                 CAUSE NO. 1:19cv989-LG-RPM

UNITED STATES ARMY CORPS OF
ENGINEERS; GENERAL TODD T.
SEMONITE, in his official capacity
as the Commanding General of the
United States Army Corps of
Engineers; MISSISSIPPI RIVER
COMMISSION; GENERAL R. MARK
TOY, in his official capacity as the
President-Designee of the
Mississippi River Commission                                       DEFENDANTS

## MEMORANDUM OPINION AND ORDER GRANTING
## DEFENDANTS' MOTION TO DISMISS

**BEFORE THE COURT** are the [14] Motion to Dismiss for Lack of

Jurisdiction and Failure to State a Claim filed by the defendants. The parties have

fully briefed the Motion. After reviewing the submissions of the parties, the record

in this matter, and the applicable law, the Court finds that this lawsuit should be

dismissed for the reasons set forth below.

## BACKGROUND

In response to devastating flooding of the Mississippi River in 1927, Congress

enacted the Flood Control Act of 1928, which authorized the creation of the

Mississippi River and Tributaries Project ("the MR&T"). 33 U.S.C. § 702a. The

United States Army Corps of Engineers ("the Corps"), under the direction of the

Secretary of the Army and supervision of the Chief of Engineers, is charged with

designing and constructing flood control projects. *See* 33 U.S.C. § 701b. The MR&T

is generally composed of four features: (1) levees and floodwalls, (2) channel

improvement and stabilization, (3) tributary basin improvements, and (4) floodways

(or spillways). *See* Mississippi River and Tributaries Project, US Army Corps of

Engineers, Mississippi Valley Division Website, https://www.mvd.usace.army.mil/

About /Mississippi-River-Commission-MRC/Mississippi-River-Tributaries-Project-

MR-T/ (last visited Sept. 9, 2021). The floodways and spillways include the

Morganza, the Bonnet Carré, the Birds-Point New Madrid, and the Atchafalaya.

*Id.*

The Bonnet Carré Spillway, which is the primary subject of this litigation,

was constructed upstream of New Orleans, Louisiana, in order to divert water from

the Mississippi River into Lake Pontchartrain. After entering Lake Pontchartrain,

the water diverted by the Bonnet Carré flows into the Mississippi Sound.[1]

The Bonnet Carré Water Control Manual, which was adopted in 1984 and

revised in 1999, provides that the Bonnet Carré was constructed to "relieve the

Lower Mississippi River of floodwater which would overtop its levees and to help

protect the valley from flooding against the 'Project Flood,' which is a hypothetical

flood greater than the record flood of 1927." (Defs.' Mot., Ex. A at 7-2, ECF No. 14-

---

[1] A more detailed description of operation of the Bonnet Carré is included in this
Court's Memorandum Opinion and Order in the companion case of *Harrison
County, Mississippi, et al. v. Mississippi River Commission, et al.,* 1:19cv986-LG-
RPM (hereafter sometimes referred to as "the County case"). The analysis included
in that opinion is adopted in the present case.

1).[2]  The Water Control Manual describes the MR&T response to the "project flood"

as follows:

> The Project Flood above the Old River Control Structure is 2,720,000
> cfs [cubic feet per second].  At the latitude of Red River Landing, the
> Project Flood is estimated at 3,030,000 cfs, of which 2,100,000 cfs is
> being carried by the Mississippi River and 930,000 cfs is being carried
> by the Atchafalaya Basin.  Of the 2,100,000 cfs flowing down the main
> river channel, 600,000 cfs are to be diverted to the Atchafalaya Basin
> via the Morganza Floodway.  Of the remaining 1,500,000 cfs flowing
> down the main channel below Morganza Floodway, 250,000 cfs are to
> be diverted to Lake Pontchartrain and the Gulf through the Bonnet
> Carré Spillway, located about 25 miles above New Orleans.  The
> remaining 1,250,000 cfs will continue down the river to the Gulf. . . .
> The Old River Control Structure, the Morganza Floodway and the
> Bonnet Carré Spillway will be operated to divert sufficient floodwater
> from the Mississippi River to minimize flood damages in the lower
> reaches and prevent the discharge in the Mississippi River from
> exceeding 1,250,000 cfs at New Orleans.

 (*Id.*)  The Manual further explains:

> Bonnet Carré will normally be operated when the flow in the
> Mississippi River below Morganza reached 1,250,000 cfs on a rising
> hydrograph or to preserve a desired level of freeboard on deficient
> levees through the New Orleans Area.  The spillway will be controlled
> so that the flow below Bonnet Carré in the Mississippi River does not
> exceed 1,250,000 cfs.

(*Id.* at 7-3).

The Morganza Floodway was constructed north of Morganza, Louisiana, in

1954.  The purpose of the Morganza is "[t]o divert water from the Mississippi River

to the Atchafalaya River . . . so as to maintain flow and stages along the main stem

Mississippi River from experiencing unacceptable stress during a major flood."

---

[2] Sometimes the Corps refers to the "project flood" as the "project design flood."
(Defs.' Supp. Reply, Ex. A at 66, ECF No. 82-1).

(Defs.' Mot., Ex. B at vi, ECF No. 14-2).  The Morganza has 125 gates that are

operated by crane.  (Defs.' Supp. Reply, Ex. A at 88-89, ECF No. 82-1). The

Morganza has been opened two times— in 1973 for 56 days and in 2011 for 55 days.

The Morganza Water Control Manual, which was last revised in February 2000,

provides, "When a major flood occurs, the [Morganza] will be operated as required to

insure [sic] the integrity of the flood control system."  (Defs.' Mot., Ex. B at 5-4, ECF

No. 14-2).  It further explains:

> Normally, Bonnet Carré Spillway will be opened when the flow in the
> Mississippi River past New Orleans reaches 1,250,000 cfs on a
> projected rise and Morganza Floodway will be opened when the flow in
> the Mississippi River below Morganza reaches 1,500,000 cfs on a
> projected rise.  The Morganza Floodway will be controlled so that the
> flow below Morganza in the Mississippi River does not exceed
> 1,500,000 cfs.  On rare occasions the Morganza Floodway may be
> required to regulate the flow below Bonnet Carré to 1,250,000 cfs.

(*Id.* at 5-5).

In 1970, Congress enacted the National Environmental Policy Act ("NEPA"),

which requires all federal agencies to prepare an Environmental Impact Statement

("EIS") for every "major Federal action."  42 U.S.C. § 4332(2)(C).  The Corps

prepared an EIS related to the MR&T in 1976.[3]

The plaintiff, Michael D. Watson, serves as Mississippi's Secretary of State.

Therefore, he is responsible for preserving Mississippi's public trust tidelands for

the people of the State of Mississippi.  *See Columbia Land Dev., LLC v. Secretary of*

---

[3] Additional information regarding the 1976 EIS is included in this Court's opinion
in *Harrison County, Mississippi, et al. v. Mississippi River Commission, et al.,*
1:19cv986-LG-RPM.

*State*, 868 So. 2d 1006, 1013-14 (Miss. 2004).[4]  Watson has sued the U.S. Army

Corps of Engineers ("the Corps"), which is responsible for the physical operation of

the MR&T.  He has also sued the Mississippi River Commission ("the MRC"),

which, he claims is responsible for decisions regarding the operation of the Bonnet

Carré Spillway.  He has also sued General Semonite, who is the Commanding

General of the Corps, and General Toy, who is the President-Designee of the MRC,

in their official capacities.  Watson claims that the defendants' operation of the

Spillway has caused "unprecedented devastation" to the Mississippi Sound, "both

ecologically and economically."  (Compl. at 2, ECF No. 1).  He seeks injunctive and

declaratory relief.

Watson has filed his claims pursuant to the Administrative Procedure Act

("APA").  He asserts that the Corps and the MRC failed to perform the full

environmental impact analysis required by NEPA.  In addition, he argues that

these defendants failed to supplement the EIS for the MR&T.

The defendants filed the present Motion to Dismiss, requesting dismissal for

lack of jurisdiction, or in the alternative, for failure to state a claim upon which

relief can be granted.  The Court took the Motion under advisement so that Watson

could conduct jurisdictional discovery "concerning any changes in the condition,

nature, and operation of the Mississippi River and Tributaries Project between 1976

---

[4] "Tidelands" refers to "those lands which are daily covered and uncovered by water
by the action of the tides, up to the mean line of the ordinary high tides."  Miss.
Code Ann. § 29-15-1.

and 2019." (Order at 2, ECF No. 69). The Court permitted the parties to provide

supplemental briefs after the conclusion of jurisdictional discovery.

## DISCUSSION

## I. MOTION TO DISMISS ON THE BASIS OF SOVEREIGN IMMUNITY

### A. THE APPROPRIATE STANDARD OF REVIEW

For the reasons stated in this Court's Memorandum Opinion and Order in

*Harrison County, Mississippi, et al. v. Mississippi River Commission, et al.,*

1:19cv986-LG-RPM, which is adopted herein by reference, the Court will construe

the Corps' Motion as a motion for summary judgment pursuant to Fed. R. Civ. P.

56.

### B. WHETHER THE CORPS IS ENTITLED TO SUMMARY JUDGMENT

Watson filed his NEPA claims pursuant to the APA, which "waives sovereign

immunity for actions against federal government agencies, seeking nonmonetary

relief, if the agency conduct is otherwise subject to judicial review." *See Louisiana*

*v. United States*, 948 F.3d 317, 321 (5th Cir. 2020); *see also* 5 U.S.C. § 702.

Sovereign immunity is not waived by § 702 of the APA unless there has been

"agency action," *Id.* at 321, which is defined to "include[ ] the whole or a part of an

agency rule, order, license, sanction, relief, or the equivalent or denial thereof, *or*

*failure to act.*" 5 U.S.C. § 551(13) (emphasis added). The APA also provides relief

for failure to act in section 706(1), which requires a reviewing court to "compel

agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

"Thus, a claim under § 706(1) can proceed only where a plaintiff asserts that an

agency failed to take a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All. (SUWA)*, 542 U.S. 55, 64 (2004). Watson's § 706(1) claim is based on (1) the inadequacy of the 1976 EIS; (2) the Corps' failure to issue a supplemental EIS; and (3) failure to open the Morganza Spillway in Louisiana to alleviate the severity of the impact on the Mississippi Sound.

## 1. ADEQUACY OF THE 1976 EIS

Watson first argues that the 1976 EIS was inadequate because it did not address environmental impacts on the Mississippi Sound. The 1976 EIS found that operation of the Bonnet Carré would affect salinity levels in the Mississippi Sound, but Watson claims that the EIS should have gone into additional detail. The Corps correctly notes that Watson's claims regarding the adequacy of the 1976 EIS are barred by the six-year statute of limitations for challenging agency action. *See* 28 U.S.C. § 2401(a); *see also Gen. Land Office v. U.S. Dep't of the Interior*, 947 F.3d 309, 318 (5th Cir. 2020) (applying the six-year statute of limitations to a NEPA claim).

## 2. WHETHER THE CORPS SHOULD BE REQUIRED TO ISSUE A SUPPLEMENTAL EIS

Watson next asserts a failure to act claim pursuant to § 706(1) based on the Corps' failure to supplement the 1976 EIS concerning impacts on the Mississippi Sound.[5] Watson claims that the following changes in circumstances required the Corps to supplement the EIS:

---

[5] The 1976 EIS has been supplemented twice, but the parties do not dispute that neither supplement addresses the impacts on the Mississippi Sound.

extensive impacts to the Mississippi Sound as evidenced by the two
Bonnet Carré Spillway openings in 2019; ecological changes to the
Mississippi Sound as a result of major events such as Hurricane
Katrina and the Deepwater Horizon oil spill; physical changes to the
shape and size of the coastline and to the barrier islands; significant
changes to the Mississippi River's geomorphology (specifically in the
form of sediment and silt deposits, which have resulted in an elevated
river bottom) as evidenced by the Corps' own study; and an undeniable
and indisputable increase in water volumes as evidenced by flood
control structures such as the Bonnet Carré Spillway being opened
more frequently than ever before.

(Compl. at 4, ECF No. 1).[6]

The Supreme Court has clarified that "an agency need not supplement an

EIS every time new information comes to light after the EIS is finalized." *Marsh v.*

*Or. Nat. Res. Council*, 490 U.S. 360, 373 (1989). An EIS must be supplemented if:

"(i) [t]he agency makes substantial changes in the proposed action that are relevant

to environmental concerns; or (ii) [t]here are significant new circumstances or

information relevant to environmental concerns and bearing on the proposed action

or its impacts." 40 C.F.R. § 1502.9(c). Under this regulation, "supplementation is

necessary only if 'there remains major Federal action to occur,' as that term is used

in [42 U.S.C.] § 4332(2)(C)." *SUWA*, 542 U.S. at 73 (citing *Marsh*, 490 U.S. at 374

(2004)). Once a court determines that major action remains to occur, it must

_____

[6] This lawsuit was filed on December 30, 2019. Any § 706(1) claims related to
Hurricane Katrina, which struck the Mississippi Gulf Coast on August 29, 2005,
and the Deepwater Horizon oil spill, which occurred on April 20, 2010, are barred by
the six-year statute of limitations. *See Davis Mountains Trans-Pecos Heritage Ass'n
v. Fed. Aviation Admin.*, 116 F. App'x 3, 17 (5th Cir. 2004) (holding that a claim for
agency delay in supplementing an EIS accrues when circumstances requiring
supplementation first arise).

consider whether "the new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered . . ." by the federal agency. *See Marsh*, 490 U.S. at 374 (cleaned up).

No major federal action remains to occur if the federal agency action being challenged has been undertaken and completed pursuant to an adequate or unchallenged NEPA process. *Oregon Nat. Res. Council Action v. U.S. Forest Serv.*, 445 F. Supp. 2d 1211, 1222 (D. Or. 2006) (citing *SUWA*, 542 U.S. at 73). Furthermore, "[w]hen an agency, responding to changing conditions, makes a decision to operate a completed facility 'within the range originally available' to it, the action is not major." *Idaho Conservation League v. Bonneville Power Admin.*, 826 F.3d 1173, 1175 (9th Cir. 2016); *see also Mayo v. Reynolds*, 875 F.3d 11, 20-21 (D.C. Cir. 2017) (explaining that an agency is not required to supplement an EIS whenever the agency later makes discretionary choices in implementing the project). Finally, supplementation is not necessary when portions of the EIS merely become out of date. *La. Crawfish Producers Ass'n-W. v. Rowan*, 463 F.3d 352, 358 (5th Cir. 2006).

Watson argues that the Bonnet Carré has been operated with greater frequency since 2008 than it had been in prior years. He also disagrees with the Corps' interpretation of the Water Control Manual. He claims that the Water Control Manual requires the Corps to open the Morganza Floodway before opening

the Bonnet Carré, but the Corps has opened the Bonnet Carré either alone or before the Morganza on several occasions.

Watson's arguments concerning interpretation of the Water Control Manual are not well-taken. Watson relies on the Manual's overview of the project design flood, which described the manner in which the project design flood would be handled by the MR&T as it proceeded toward the Gulf of Mexico. Watson emphasizes the following language in this overview: "*Of the remaining* 1,500,000 cfs flowing down the main channel below Morganza Floodway, 250,000 cfs are to be diverted to Lake Pontchartrain and the Gulf through the Bonnet Carré Spillway, located about 25 miles above New Orleans." (Defs.' Mot., Ex. A at 7-2, ECF No. 14-1) (emphasis added). However, the Morganza and Bonnet Carré Manuals do not contemplate a specific sequence for opening these structures. The Morganza is opened when the flow in the Mississippi River below Morganza reaches 1,500,000 cfs, and the Bonnet Carré is opened when the flow in the Mississippi River past New Orleans reaches 1,250,000 cfs, without regard to any sequence. The Morganza Water Control Manual makes this clear when it states, "*On rare occasions* the Morganza Floodway may be required to regulate the flow below Bonnet Carré to 1,250,000 cfs." (Defs.' Mot., Ex. B at 5-5, ECF No. 14-2) (emphasis added). Mr. Windham testified on behalf of the Corps that "the trigger" for opening the Bonnet Carré is met before "the trigger" for the Morgana Floodway because that is how the river rises due to rainfall and backwater. (Defs.' Supp. Reply, Ex. A at 204, ECF No. 82-1).

The parties do not dispute that the Bonnet Carré Spillway is a completed project. The Court cannot review the Corps' routine day-to-day operation of this flood control structure. *See Lujan*, 497 U.S. at 899. Furthermore, the record reveals that the Corps, in its discretion, has merely responded to changes in the weather that occur from year to year. The Corps has not made or proposed any changes to its operation of the Spillway that would constitute "major Federal actions." Finally, the Corps' actions have not deviated from those contemplated by the 1976 EIS or its Water Control Manuals. The 1.25 million cfs standard that the Corps currently uses to operate the Bonnet Carré was specified in a report by the Corps' Chief of Engineers in December 1927. (Defs.' Supp. Reply, Ex. D at 27, ECF No. 82-4). This Court can only order the Corps to draft a supplemental EIS if the Corps proposes a major federal action that deviates from the original project. No evidence or testimony presented to the Court supports a finding of major federal action.

Watson next argues that the Corps should be required to issue a supplemental EIS because the overall MR&T project has not been completed. A plaintiff "cannot seek wholesale improvement of [an agency program] by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." *See Lujan*, 497 U.S. at 891. The plaintiff "must direct its attack against some particular 'agency action' that causes it harm." *Id*. Watson has not pointed to any discrete action that the Corps has proposed for the MR&T project that will cause harm to the Mississippi Tidelands.

There is no evidence or testimony that creates a genuine issue of material fact; the

Court does not have jurisdiction to consider Watson's claims. This determination

encompasses both Watson's claims against the Corps as well as his claims against

General Semonite in his official capacity. *See Kentucky*, 473 U.S. at 165-67 (holding

that official-capacity claims "generally represent only another way of pleading an

action against an entity of which an officer is an agent.").

### 3. WHETHER THE CORPS SHOULD BE REQUIRED TO OPEN THE MORGANZA SPILLWAY

NEPA does not prohibit the undertaking of federal projects patently

destructive of the environment; it simply mandates that the agency gather, study,

and disseminate information concerning the projects' environmental consequences.

*Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 676 (5th Cir. 1992).

"Other statutes may impose substantive environmental obligations on federal

agencies, but NEPA merely prohibits uninformed—rather than unwise—agency

action." *Id.* 5 U.S.C. § 706(1) only empowers a court to compel an agency "to

perform a ministerial or non-discretionary act," or "to take action upon a matter,

without directing how it shall act." *SUWA*, 542 U.S. at 63-64.

At most, the Court can require the Corps to "take a hard look" at the

environmental consequences of its actions; the Court has no authority to dictate

which actions the Corps should take. Therefore, the Court cannot compel the Corps

to open the Morganza Spillway more frequently. Watson's NEPA claims seeking

this relief must be dismissed.

## CONCLUSION

The MRC is not an "agency" under the terms of the APA. For the reasons stated in this Court's Memorandum Opinion and Order entered in *Harrison County, Mississippi, et al. v. Mississippi River Commission, et al.,* 1:19cv986-LG-RPM, which is adopted herein by reference, the defendants' Rule 12(b)(6) Motion to Dismiss MRC and General Toy is granted.

In addition, for the forgoing reasons, and for the reasons stated in this Court's Memorandum Opinion and Order in *Harrison County, Mississippi, et al. v. Mississippi River Commission, et al.,* 1:19cv986-LG-RPM, which is adopted herein by reference, the Corps' Motion to Dismiss for Lack of Jurisdiction must be granted.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the [14] Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim filed by the defendants is **GRANTED**. The plaintiff's claims against the Mississippi River Commission, General R. Mark Toy, the United States Army Corps of Engineers, and General Todd T. Semonite are **DISMISSED WITH PREJUDICE**. The Court will enter a separate judgment pursuant to Fed. R. Civ. P. 58.

**SO ORDERED AND ADJUDGED** this the 13th day of September, 2021.

s/ *Louis Guirola, Jr.*

LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE